INDIANA WHOLESALE WINE
& LIQUOR COMPANY,
INC., Appellant,

v.

STATE of Indiana ex rel. INDIANA ALCOHOLIC BEVERAGE COMMISSION, National Wine & Spirits Corporation, and Olinger Distributing Co., Inc., Appellees.

No. 49S02–9609–CV–606.

Supreme Court of Indiana.

May 28, 1998.

Lee B. McTurnan, Wayne C. Turner, Jacqueline B. Ponder, Matthew W. Foster,

McTurnan & Turner, Indianapolis, for Indiana Wholesale Wine & Liquor Company, Inc.

Evan E. Steger, Edward P. Steegmann, Ice, Miller, Donadio & Ryan, Indianapolis, for National Wine & Spirits Co. and Olinger Distributing Co., Inc.

William W. Hurst, Michael T. McNelis, Mitchell, Hurst, Jacobs & Dick, Indianapolis, for Olinger Distributing Co., Inc.

Pamela Carter, Attorney General, Jon Laramore, Deputy Attorney General, Indianapolis, for Indiana Alcoholic Beverage Commission.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

This unusual case involves a dispute over whether an Indiana statute allows a particular corporation to hold wine and liquor wholesalers' permits. After granting the permits in 1987, the Indiana Alcoholic Beverage Commission apparently second-guessed its own decision in 1991 and sought court guidance as to whether it was right. When the case reached the Indiana Court of Appeals, that court invalidated the statute as violative of the federal constitution.

In brief, we conclude that the Alcoholic Beverage Commission was right in the first place and that it was unnecessary, and inappropriate, for the Court of Appeals to reach the constitutional issue. Our analysis follows.

### Background

Indiana Wholesale Wine & Liquor Company, Inc. ("Indiana Wholesale"), applied for wine and liquor wholesalers' permits from the Indiana Alcoholic Beverage Commission ("Commission") in 1987. National Wine & Spirits Corporation ("National") and Olinger Distributing Company, Inc. ("Olinger"), both holders of corporate wholesalers' permits, opposed Indiana Wholesale's application. The Commission conducted an extensive investigation into the corporate structure of Indiana Wholesale, including background checks on Indiana Wholesale's shareholders and their adult children. Based on the results of this investigation, the Commission determined on September 16, 1987, that Indiana Wholesale satisfied all statutory requirements for corporate wholesaler permittees and issued the wholesalers' permits. Implicit in this determination was the Commission's conclusion that Indiana Wholesale's corporate structure conformed to the requirements of Ind.Code § 7.1–3–21–5 (1993 & Supp.1997) (the "Residency Statute"),[1] the text of which is set forth and discussed in part II, *infra.*

National and Olinger, together with Wine & Spirits Wholesalers,[2] disputed this conclusion and brought suit on September 28, 1987, challenging the validity of Indiana Wholesale's permits. The trial court dismissed the suit and the Court of Appeals affirmed, finding that National, Olinger and Wine & Spirits Wholesalers lacked standing to challenge the award of the permit. *See Wine & Spirits Wholesalers of Indiana, Inc. v. Indiana Alcoholic Beverage Comm'n,* 556 N.E.2d 17 (Ind.Ct.App.1990), *trans. denied.* As such, the Commission's 1987 interpretation of the Residency Statute remained intact.

However, apparently doubting its own interpretation, the Commission commenced on August 7, 1991, the present declaratory judgment action seeking "judicial guidance on the meaning and application of [the Residency Statute] with respect to [Indiana Wholesale]." In asking the court's interpretation of the Residency Statute, the Commission did not advance an interpretation of its own. Named as defendants in the action were Indiana Wholesale and National and Olinger.[3]

---

1. For purposes of convenience, further citations to the Residency Statute refer to the version at Ind.Code § 7.1–3–21–5 (1993 & Supp.1997), which is substantively identical to the statutes in effect at critical times throughout this litigation.

2. Wine & Spirits Wholesalers is a trade organization of Indiana corporate holders of wine and liquor wholesaler permits and of which National and Olinger were members.

3. Indiana Wholesale advocated a conflicting interpretation of the Residency Statute from National and Olinger. Indiana Wholesale argued in favor of the literal interpretation the Commission implicitly adopted in 1987 when it issued wholesalers' permits to Indiana Wholesale. National

Indiana Wholesale moved for summary judgment on the construction and constitutionality [4] of the Residency Statute and also moved to dismiss National and Olinger for lack of standing; the trial court denied the latter motion. On March 4, 1994, the trial court ruled on Indiana Wholesale's motion for summary judgment and found that (1) the Residency Statute was ambiguous; (2) both Indiana Wholesale's and National and Olinger's interpretations were reasonable; and (3) the Commission was the proper body to decide which meaning to apply. The trial court declined to rule on any constitutional issue.

All parties appealed the trial court's ruling and presented for appellate review arguments substantially similar to those advanced at trial. The Court of Appeals concluded that (1) the Commission properly named National and Olinger as defendants; (2) both interpretations of the Residency Statute facially discriminated against interstate commerce and violated the Commerce Clause; and (3) the Twenty-first Amendment did not save the Residency Statute from "constitutional infirmity." *Indiana Wholesale Wine & Liquor Co. v. Indiana Alcoholic Beverage Comm'n*, 662 N.E.2d 950, 954 (Ind.Ct.App. 1996). Having resolved the dispute on constitutional grounds, the Court of Appeals did not address any arguments relating to the meaning and application of the Residency Statute. *Id.*

Upon the petitions of the Commission and National and Olinger, this Court granted transfer on September 18, 1996.

and Olinger maintained that the Residency Statute required resident ownership of a controlling interest in corporate wholesaler permittees. These positions will be discussed in greater detail, *infra.*

**4.** The constitutional arguments center on whether in this context the Commerce Clause of the U.S. Constitution (art. I, § 8—generally limiting state interference with interstate commerce) predominates over the Twenty-first Amendment (generally authorizing states to regulate the transportation of alcoholic beverages). In brief, the position of the parties on the constitutional arguments were as follows: Indiana Wholesale reserved the right to argue that National and Olinger's interpretation of the Residency Statute violated the Commerce Clause in the event the trial court found their interpretation reasonable and adopted it. National and Olinger maintained that their interpretation of the Residency

### Discussion

The Commission contends that, contrary to the Court of Appeals' decision, the Residency Statute is constitutional and asks this Court to construe the meaning and application of the Residency Statute. National and Olinger likewise argue that the Residency Statute is constitutional but do not seek further guidance on its meaning. Indiana Wholesale claims that the Court of Appeals erroneously decided the case on constitutional grounds, [5] and asks this Court to defer to the Commission's original construction of the Residency Statute which the Commission implemented by issuing wholesalers' permits to Indiana Wholesale in 1987.

### I

As a threshold matter, the issue of standing must be resolved. The Commission instituted this declaratory judgment action pursuant to Ind.Code § 7.1–2–8–3,[6] which provides in relevant part:

The commission shall have the authority also to initiate, in the name of the State of Indiana on the relation of the commission, an action to obtain a declaratory judgment as to the meaning, application, or constitutionality of a provision of this title or of a rule or regulation of the commission or an order of the commission. The action shall be brought in any court having civil jurisdiction within Marion County against a

Statute did not violate the Commerce Clause because the statute directly relates to "core concerns" of the Twenty-first Amendment. The Commission took no position on the construction or application of the Residency Statute, but argued that the ownership requirement did not constitute economic protectionism and that the statute was not unconstitutional.

**5.** As it did at the trial court level, Indiana Wholesale also argues that, in the event we agree with National and Olinger's interpretation of the Residency Statute, we nevertheless should find it to be unconstitutional.

**6.** This and further citations to Ind.Code § 7.1–2–8–3 refer to the version in the 1993 edition of the Indiana Code, which is substantively identical to the version effective when the Commission commenced this action.

permittee or other person. The proceedings shall conform to the Indiana Rules of Civil Procedure concerning declaratory judgments.

Ind.Code § 7.1–2–8–3 (1993).

■ The Court of Appeals found that, although the Commission could not have maintained a similar action under the Uniform Declaratory Judgment Act,[7] the option nonetheless was available to the Commission due to the unique nature of Ind.Code § 7.1–2–8–3. *Indiana Wholesale Wine & Liquor Co.,* 662 N.E.2d at 956 n. 7. The court also found that, under this statute, the Commission properly named National and Olinger as co-defendants. *Id.* at 957. *See* Ind.Code § 7.1–2–8–3 ("The action shall be brought ... *against a permittee or other person.*") (emphasis added). We agree with and incorporate by reference this portion of the Court of Appeals' opinion into our decision today. Ind.Appellate Rule 11(B)(3).

## II

The Commission's purpose in bringing this declaratory judgment action was to seek "judicial guidance on the meaning and application of [the Residency Statute] with respect to [Indiana Wholesale]."[8] The Residency Statute states in pertinent part:

(a) Corporations. The commission shall not issue an alcoholic beverage wholesaler's ... permit of any type to a corporation unless *sixty percent (60%) of the outstanding common stock* is owned by persons who have been continuous and bona fide residents of this state for five (5) years.

(b) The commission shall not issue an alcoholic beverage wholesaler's permit of any type to a corporation unless at least one (1) of the stockholders shall have been a resident, for at least one (1) year immediately prior to making application for the permit, of the county in which the licensed premises are to be situated.

(c) Each officer and stockholder of a corporation shall possess all other qualifications required of an individual applicant for that particular type of permit.

Ind.Code § 7.1–3–21–5 (emphasis added).

### A

The parties contest the meaning of the phrase "common stock" as used in the Residency Statute. Indiana Wholesale favors the interpretation which the Commission utilized when it issued wholesalers' permits to Indiana Wholesale in 1987, and urges this Court to utilize the Commission's 1987 interpretation. National and Olinger, on the other hand, propose that "common stock," as used in the Residency Statute, means "controlling interest" and contend that the legislative history of the Residency Statute supports their interpretation.

### A–1

■ Generally, when construing a statute, the interpreting body attempts to give words their plain and ordinary meanings. *Cox v. Worker's Compensation Bd.,* 675 N.E.2d 1053, 1057 (Ind.1996) (interpreting worker's compensation statute); *Clifft v. Ind. Dep't of State Revenue,* 660 N.E.2d 310, 316 (Ind. 1995) (interpreting controlled substance excise tax statute); *Indiana Dep't of Public Welfare v. Couch,* 605 N.E.2d 165, 167 (Ind. 1992) (interpreting comparative fault statute). Here, the parties dispute the meaning of the phrase "common stock," which the Commission effectively interpreted as meaning a class of stock, other than preferred, and not necessarily a controlling interest.

■ Black's Law Dictionary defines "common stock" as the class of corporate stock representing residual ownership of the corporation, having voting powers, participating in profits by way of dividends (after payment to preferred stockholders), and sharing lastly in corporate property upon dissolution. Black's

---

7. The Uniform Declaratory Judgment Act is codified at Ind.Code §§ 34–4–10–1 to –16 (1993). Pursuant to Ind.Code §§ 34–4–10–2 & –13, state agencies lack standing to seek declaratory judgments.

8. We note that, although Ind.Code § 7.1–2–8–3 permits the Commission to seek "a declaratory judgment as to the ... constitutionality" of the Residency Statute, the Commission did not do so.

Law Dictionary 278 (6th ed. 1991).[9] Traditionally, "common stock" has meant stock that "has a full voting right and unlimited proportionate right to share in the firm's residual earnings." 11 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 5086 (perm. ed. rev. vol. 1990).[10]

According to its Articles of Incorporation, Indiana Wholesale has authority to issue 1,000 shares of stock, with 500 shares denominated common stock and 500 shares denominated preferred stock. Of those shares issued, Indiana residents own 60% of the common shares; non-residents own the remaining 40% of common shares and 100% of the preferred shares. Indiana Wholesale's Articles of Incorporation require a two-thirds vote of common stockholders for most corporate actions. Preferred stockholders have voting rights in three circumstances: a plan of merger or share exchange, the sale or lease of substantially all corporate assets, and a voluntary dissolution. Approval of any one of these courses of action requires a two-thirds combined vote of common and preferred stockholders. Common stockholders participate in dividend distribution after preferred stockholders are paid in full, and share lastly in corporate property upon liquidation. The corporate structure of Indiana Wholesale therefore comports with the literal language of the Residency Statute as well as with the "plain and ordinary meaning" of the phrase "common stock." [11]

### A-2

The legislative history of the Residency Statute tends to suggest that the General Assembly more than 50 years ago purposely removed any control requirement from the statutory language,[12] and further distinguished between common stock ownership and control of a corporate wholesaler permittee.

Throughout the greater part of this century, Indiana has imposed some sort of residency requirement on applicants for alcoholic beverage licenses.[13] The Alcoholic Beverage Act of 1935 provided in part that:

> No liquor wholesaler's permit shall be issued or continued in effect, if issued, to any person who is not a bona fide resident of the State of Indiana and continues to be such resident while said wholesaler's permit is in force, or to any co-partnership any of the members of which are not bona fide residents of the State of Indiana.

1935 Ind.Acts 226, § 17.[14]

In 1939, the legislature amended the Alcoholic Beverage Act of 1935 to allow corporations to hold beer wholesaler's permits, so long as "the stockholders thereof [are] citizens of the State of Indiana[.]" 1939 Ind. Acts 30, § 2. In 1945, the General Assembly created the Indiana Alcoholic Beverage Commission, consolidated the residency require-

---

9. Contrast this with the definition of preferred stock: Preferred stock has "preferential rights to dividends or to amounts distributable on liquidation, or to both, ahead of common shareholders." Black's Law Dictionary 1179 (6th ed. 1991).

10. Fletcher defines preferred stock as having "a preferential, although limited, right to payment and no voting rights." 11 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 5086 (perm. ed. rev. vol. 1990).

11. The Indiana Business Corporation Law ("BCL"), codified at Ind.Code § 23–1–17–1 through § 23–1–54–3, does not define common or preferred stock except in the context of business combinations. *See* Ind.Code §§ 23–1–43–6 & –12 (1993). This purposeful omission reflects the contemporary preference for flexible corporate structure. See Official Comment to § 6.01 of the Revised Model Business Corporation Act, on which the BCL is based. *See* Introduction to

Ind.Code Ann. § 23–1–17–1 (West 1989); 1986 Ind.Acts 149.

12. To demonstrate the General Assembly's awareness and mastery of the semantics, Indiana Wholesale references other sections of Title 7.1 which either use the broader term "stock" to indicate a controlling interest, or clearly impose a residency requirement, or plainly distinguish between residents and non-residents in the differing contexts of individual, partnership, and corporate permittees. *See* Indiana Wholesale's Brief in Opp. to Commission's Pet. to Transfer at 7–8.

13. This legislative history was derived from the trial court's findings. (R. at 759–63.)

14. This statute does not specifically mention corporations, which were included in the general definition of "person." *See* 1935 Ind.Acts 226, § 3(*l*).

ments for beer, wine, and liquor permits, and reduced the resident ownership requirement for corporations to "eighty (80) per centum of outstanding *common* stock." 1945 Ind.Acts 357, § 10 (emphasis added). By 1965, the General Assembly had reduced further the resident ownership requirement to 60% of common stock. 1965 Ind.Acts 256, § 1. A similar version of the Residency Statute remains in effect today.[15] *See* Ind.Code § 7.1-3-21-5.

The evolution of the Residency Statute arguably evinces a legislative intent not to mandate resident control of corporate wine and liquor wholesaler permittees. Had the General Assembly intended to impose a control requirement, as National and Olinger suggest, it could have retained the broader language of the Alcoholic Beverage Act of 1939, *i.e.*, requiring 100% resident ownership corporate wholesaler permittees; instead, in 1945, it inserted the adjective "common" before the word "stock" and reduced the resident ownership quota to 80%, which it further reduced to 60% in 1965.

The corporate structure of Indiana Wholesale tracks the literal language of the Residency Statute, and the statute's legislative history suggests that the General Assembly intended to eliminate any control requirement from the statutory language. For these reasons, we agree with Indiana Wholesale and the trial court that the Commission's 1987 interpretation of the Residency Statute is reasonable.

### B

■ We have reflected with some care on the effect of the Commission's filing of the declaratory judgment action on its 1987 interpretation of the Residency Statute be-

cause the Commission's filing of this action arguably constituted an abandonment of that interpretation. *See, e.g., Miller Brewing Co. v. Bartholemew County Beverage Co.*, 674 N.E.2d 193, 201 (Ind.Ct.App.1996) (Commission's rescission of order interpreting alcoholic beverage statute constituted abandonment of its prior position and resulted in no deference being due), *trans. denied* 683 N.E.2d 592 (1997).[16]

■ We conclude that the Commission's actions do not rise to the level of rescission of its 1987 interpretation. The Commission has never revoked Indiana Wholesale's permits. Nor has it published any additional interpretive materials on the subject of the Residency Statute since issuing wine and liquor wholesalers' permits to Indiana Wholesale in 1987. For these reasons, we find that the Commission's 1987 interpretation of the Residency Statute is still effective.

### C

Once the trial court determined that the Commission's 1987 interpretation of the Residency Statute was reasonable, the trial court should have terminated its analysis and not addressed the reasonableness of National and Olinger's interpretation. Because National and Olinger's interpretation directly conflicted with the Commission's 1987 interpretation, the court's findings of dual reasonableness undermined the general policies of acknowledging the expertise of agencies empowered to interpret and enforce statutes and increasing public reliance on agency interpretations. *See Sullivan v. Day*, 681 N.E.2d 713, 716 (Ind.1997) (adopting by reference that portion of the opinion of the Court of Appeals, 661 N.E.2d 848, 854 (Ind.

**15.** The Residency Statute imposes its ownership requirement on *all* corporate holders of alcoholic beverage wholesaler's permits. Ind.Code § 7.1-5-9-5 further *restricts nonresident interests in beer* wholesalers' permits:

> It is unlawful for a person to employ or use a domestic corporation or foreign corporation admitted to do business in Indiana, or the ownership or control of a corporation, as a means, subterfuge, or instrumentality to enable a nonresident person to own or control or

acquire an interest in a beer wholesaler's permit under this title.

Ind.Code § 7.1-5-9-5 (1993).

**16.** The potential of rescission is of concern because the courts of this state employ a general policy of giving "great weight" to the interpretation of a statute by an administrative agency charged with its enforcement. *Natural Resources Comm'n v. Porter County Drainage Bd.*, 576 N.E.2d 587, 588 (Ind.1991) (citing *Bender v. State ex rel. Wareham*, 180 Ind.App. 236, 239, 388 N.E.2d 578, 581 (1979)).

Ct.App.1996), which held that where both the plaintiffs and the administrative agency advanced plausible interpretations of a statute, the trial court erred in not deferring to the reasonable agency interpretation).

### III

The Court of Appeals hinged its decision on the constitutionality of the Residency Statute on, and built its opinion around, an in-depth analysis of the interplay between the Commerce Clause and the Twenty-first Amendment.[17] The court held that the Residency Statute was (1) facially discriminatory and subject to strict scrutiny, and (2) not saved by the Twenty-first Amendment because the statute did not advance a "core concern" of the Amendment. *Indiana Wholesale Wine & Liquor*, 662 N.E.2d at 969. Having determined that the Residency Statute was unconstitutional, the Court of Appeals did not address the issue of statutory construction.

On petition to transfer to this Court, the parties reiterate the arguments made in the courts below on the other-than-constitutional issues. As to the constitutional analysis of the Court of Appeals, the Commission and National and Olinger argue that the Residency Statute is *per se* constitutional or, while facially discriminatory, is saved by the Twenty-first Amendment; Indiana Wholesale invites this Court to adopt the Commission's 1987 interpretation of the Residency Statute and avoid the constitutional issue. For the reasons set forth below, we accept Indiana Wholesale's invitation.

■■■ The doctrine of judicial restraint in deciding the constitutionality of statutes

traces its genesis to Chief Justice Marshall,[18] but it was Justice Brandeis's concurring opinion in *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), "that gave the principle so much of its enduring importance."[19] In *Ashwander*, Justice Brandeis set forth "a series of [seven] rules under which [the Court] ha[d] avoided passing upon a large part of all the constitutional questions pressed upon it for decision." 297 U.S. at 346, 56 S.Ct. at 482 (Brandeis, J., concurring). Two of the rules present themselves for invocation in the case at hand. First, "[t]he [Supreme] Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.... Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction ..., the Court will decide only the latter." *Id.* at 347, 56 S.Ct. at 483 (Brandeis, J., concurring) (citing *Siler v. Louisville & N.R. Co.*, 213 U.S. 175, 191, 29 S.Ct. 451, 454–55, 53 L.Ed. 753 (1909)). Second, "'[w]hen the validity of [a statute] is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that [the Supreme Court] will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Id.* at 348, 56 S.Ct. at 483 (Brandeis, J., concurring) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296–97, 76 L.Ed. 598 (1932)).

This doctrine is well established in U.S. Supreme Court jurisprudence. *See, e.g., Edward J. DeBartolo Corp. v. Florida Gulf*

---

**17.** In a footnote, the Court of Appeals rejected Indiana Wholesale's argument that the court should adopt the Commission's interpretation of the Residency Statute and thus obviate any need to address the constitutional issue. *Indiana Wholesale Wine & Liquor Co. v. State ex rel. Ind. Alcoholic Beverage Comm'n*, 662 N.E.2d 950, 959 n. 12 (Ind.Ct.App.1996).

**18.** "It has also been observed that an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains[.]" *Murray v. The Charming Betsy*, 2 Cranch 64, 6 U.S. 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.). *See also Ex parte Randolph*, 20 F.Cas. 242, 254 (Cir.Ct.Va.1833) ("If [constitu-

tional questions] become indispensably necessary to a case, the court must meet and decide them; but if the case may be determined on other points, a just respect for the legislature requires, that the obligation of its laws should not be unnecessarily and wantonly assailed.").

**19.** Frederick Schauer, *Ashwander Revisited*, 1995 Sup.Ct.Rev. 71 (critiquing the present-day utility of the *Ashwander* principles). See also Alexander M. Bickel, *The Least Dangerous Branch* (1962), Ch. 4, for a discussion of the "passive virtues" of the judiciary, including the doctrine of judicial restraint.

*Coast Bldg. and Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988) (construing statute to avoid constitutional problems and tracing principle's origins to *Murray v. The Charming Betsy,* 2 Cranch 64, 6 U.S. 64, 118, 2 L.Ed. 208 (1804) (Marshall, C.J.)); *Rescue Army v. Los Angeles Mun. Ct.,* 331 U.S. 549, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947) (discussing several *Ashwander* principles and declining to decide imprecisely presented constitutional issue).

And we recently discussed its application in Indiana jurisprudence. *Citizens Nat'l Bank of Evansville v. Foster,* 668 N.E.2d 1236, 1241 (Ind.1996) ("Both state and federal courts traditionally foreswear deciding a constitutional question unless no non-constitutional grounds present themselves for resolving the case under consideration."). *See also Bayh v. Sonnenburg,* 573 N.E.2d 398, 402 (Ind.1991) (discussing Court of Appeal's failure to address four viable non-constitutional theories in favor of deciding a constitutional issue), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 415 (1992); *State v. Darlington,* 153 Ind. 1, 4, 53 N.E. 925, 926 (1899) ("[C]ourts will not pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause. This court has repeatedly held that questions of this character will not be decided unless such state decision is absolutely necessary to a disposition of the cause on its merits.").

■ We have before us today parties who raise questions of both statutory construction and (primarily as a result of the approach taken by the Court of Appeals) constitutionality. The case thus provides a paradigmatic opportunity for application of the *Ashwander* principles enunciated above. As this Court has stated previously, "[w]hile a reviewing court can freely choose any apparent statutory or common law basis upon which a judgment can be sustained, constitutional issues are to be avoided as long as there are poten-

tially dispositive statutory or common law issues still alive." *Sonnenburg,* 573 N.E.2d at 402.

■ Here, the Court of Appeals chose not to adhere to the doctrine of judicial restraint, and instead put forth a well-reasoned constitutional analysis of the Residency Statute, ultimately concluding that the statute is unconstitutional. The court justified this resolution by saying that because the Residency Statute—however interpreted—is unconstitutional, the issue of statutory construction need not be reached. We reject this justification.

■ The judiciary is but one of three co-equal branches of government, each with its own powers and functions. The constitution empowers the legislative branch to make law; the judicial branch to decide cases.[20] On occasion, to perform properly its constitutional function, a court must address and resolve the constitutionality of a legislative enactment. But when it does so, it is an exercise of the power to decide the case before it. To do so when not required to decide the case can impinge upon the lawmaking function which separation of powers reserves for the legislature. The policy of judicial restraint is not "merely procedural" but rather is "one of substance, grounded in considerations which transcend . . . limitations. . . . The policy's ultimate foundations . . . lie in all that goes to make up the unique place and character, in our scheme, of judicial review of governmental action for constitutionality. They are found in the delicacy of that function[;] the necessity . . . for each [branch of government] to keep within its power; [and] the inherent limitations of the judicial process. . . ." *Rescue Army,* 331 U.S. at 570–71, 67 S.Ct. at 1420–21.

■ Here, the Court of Appeals failed to recognize the inherent limitations of the judicial process and instead violated the reviewing court's duty "first [to] ascertain whether a construction of the statute is fairly possible by which the question may be avoided."

---

20. Although the Indiana Constitution lacks the "cases" and "controversies" language of Art. III, § 2, of the United States Constitution, the separation of powers language of Art. III, § 1, fulfills

an analogous function. *Indiana Dep't of Envtl. Mgt. v. Chemical Waste Mgt., Inc.,* 643 N.E.2d 331, 336 (Ind.1994).

*Ashwander*, 297 U.S. at 348, 56 S.Ct. at 483 (Brandeis, J., concurring). Rather than confronting the constitutional question *ab initio*, the Court of Appeals had several avenues available to it. It could have remanded the issue to the Commission for a definitive interpretation of the Residency Statute. Or it could have found the Commission's 1987 interpretation to be reasonable. This would have avoided the constitutional question because none of the parties directly challenged at that time the constitutionality of the Commission's interpretation. Only by adopting National and Olinger's interpretation would it have needed to address the constitutionality of the Residency Statute;[21] then the court would have addressed the issues in the proper order. Because the underlying issue in this case was one of statutory construction, separation of powers among the branches demanded that the Court of Appeals not decide the constitutionality of the Residency Statute unless resolution of the issue was necessary to decide the dispute before it.

■ Our statutes are clothed with a presumption of constitutionality. *See Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind. 1996); *Indiana Dep't of Envtl. Mgmt. v. Chemical Waste Mgmt., Inc.*, 643 N.E.2d 331, 336 n. 2 (Ind.1994). In the absence of a direct challenge to the constitutionality of the Commission's interpretation of the Residency Statute, the Court of Appeals rendered a judgment exceeding the scope of the issues before it and unnecessary to the disposition of the case. *See Ashwander*, 297 U.S. at 347, 56 S.Ct. at 483 (Brandeis, J., concurring) ("The Court will not formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (citations and internal quotation marks omitted)).

This Court repeatedly has refused to adjudicate constitutional questions when presented with other dispositive issues. *See, e.g.,*

*Pence v. State*, 652 N.E.2d 486 (Ind.1995) (statutory challenge by citizens and taxpayers dismissed for lack of standing); *Chemical Waste Mgmt.*, 643 N.E.2d 331 (challenge to good character statute dismissed for unripeness, although Court did comment on constitutional issues as guidance for agency's future application of statute). Here, we face a dispute over statutory construction which we can resolve by deferring to the reasonable interpretation of the administrative agency charged with enforcing the statute. Consistent with the demands of separation of powers, we decline to address the constitutionality of the Residency Statute and find that the Court of Appeals erred in doing so.

### Conclusion

Having previously granted transfer, we now (1) adopt and incorporate by reference that portion of the Court of Appeals' opinion dealing with the issue of standing as discussed in part I, *supra;* (2) vacate the remainder of the opinion of the Court of Appeals; and (3) defer to the Commission's prior reasonable interpretation of the Residency Statute.

SHEPARD, C.J., and DICKSON, SELBY and BOEHM, JJ., concur.

---

21. We frequently observe that one of the general rules of statutory construction is to interpret a statute so as to save it from constitutional invalidity. *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind.1996) ("If there are two reasonable interpretations of a statute, one of which is constitutional and the other not, we will choose that path which permits upholding the statute....").

On the other hand, separation of powers prevents a court from effectively rewriting a statute to save it from constitutional infirmity. *Grody v. State*, 257 Ind. 651, 659–60, 278 N.E.2d 280, 285 (1972) (quoting *Aptheker v. Secretary of State*, 378 U.S. 500, 515, 84 S.Ct. 1659, 1668–69, 12 L.Ed.2d 992 (1964)).