**LTV STEEL COMPANY, Appellant (Plaintiff below),**

v.

**John P. GRIFFIN (formally Kenneth Zeller), In His Capacity as the Commissioner of the Indiana Department of Labor, Appellee (Defendant below).**

No. 49S04–9811–CV–692.

Supreme Court of Indiana.

June 30, 2000.

S.R. Born, Ellen D. Gregory, George Norwood, Ice Miller Donadio & Ryan, Indianapolis, IN, Attorneys for Appellant.

Lewis D. Beckwith, Danelle Miller Marks, Baker & Daniels, Indianapolis, IN, Attorneys for Amicus Curiae Indiana Legal Foundation.

Jeffery A. Modisett, Attorney General of Indiana, Jon Laramore, Rafal Ofierski, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

An employer was charged with serious and knowing workplace safety violations after a state inspection. The state safety review board (the adjudicator of workplace safety violations) dismissed the charges because it found that the safety inspector had a conflict of financial interest. We reverse, holding that an employer is not entitled to dismissal of such charges on this basis.

### Background

The Indiana Occupational Safety and Health Act ("IOSHA") requires Hoosier employers to "establish and maintain conditions of work which are reasonably safe and healthful for employees, and free from recognized hazards that are causing or are likely to cause death or serious physical harm to employees." Ind.Code § 22–8–1.1–2.[1] Under IOSHA, an Occupational Safety Standards Commission is authorized to promulgate safety and health standards. *Id.* § 22–8–1.1–7. In addition, IOSHA adopts certain federal occupational safety and health standards as standards of the Indiana Occupational Safety Standards Commission. *Id.* § 22–8–1.1–13.1.[2] Every Indiana employer is required to "comply with the occupational health and safety standards promulgated under" IOSHA. *Id.* § 22–8–1.1–3.1.

The Commissioner of the Indiana Department of Labor and the Commissioner's designated representatives are charged with administering and enforcing IOSHA and the safety standards adopted by the Standards Commission.[3] *Id.* § 22–8–1.1–22.1. The Commissioner and designated representatives are authorized by IOSHA to "enter without delay and inspect at all reasonable times places of employment in order to enforce any provisions of [IOSHA], including occupational safety and health standards." *Id.* § 22–8–1.1–23.1.[4]

This case arises out of such an inspection. Between April 11 and August 15, 1991, an IOSHA compliance safety and health officer conducted an inspection of LTV Steel Company's Harbor Works Facility ("LTV Steel") in East Chicago, Indiana. The investigation identified a series of alleged violations. Pursuant to the Commissioner's authority under section 25.1 of IOSHA, the Commissioner issued two notices of alleged violations, referred to in IOSHA as "safety orders," to LTV Steel.

The first safety order listed fourteen alleged "serious" violations[5] of IOSHA safety standards including:

---

1. All IOSHA references to the Indiana Code and Indiana Administrative Code, tit. 610, art. 4, r. 3, in this opinion are to the year 1988, which were the Codes in effect at the time of the inspection.

2. Repealed in 1994; now see Ind.Code § 22–8–1.1–16.2 (1998).

3. Unless the context otherwise requires, the term "IOSHA" as used in this opinion encompasses the Indiana Occupational Safety and Health Act and the safety standards thereunder.

4. Effective in 1995, the legislature exempted certain employers from this right of entry in certain circumstances. Ind.Code § 22–8–1.1–23.1 (Supp.1995) (as amended by P.L. 221–1995, § 1, P.L. 220–1995, § 1).

5. Ind.Code § 22–8–1.1–27.1(b) (1988) defines a "serious" violation as one where "there is a substantial probability that death or serious physical harm could result from a condition which exists from one or more practices, means, methods, operations, or processes, which have been adopted or are in use, in the place of employment, unless the employer did not know and could not, with the exercise of reasonable diligence, have known of the presence of the violation." At the time of LTV Steel's inspection, employers who committed

1. Storage of steel coils between five and six feet in height in a way that obscured the vision of employees operating a remote control crane in a high volume traffic area.

2. Transporting scrap hoppers down aisleways overloaded and with sharp pieces of steel hanging over the sides causing a hazard to persons walking or moving into the aisles.

3. Potholes and a large oil spill in the floor area around a tin mill coil storage stand conveyor.

4. Huge potholes and uneven floor area where the slab carriers transport slabs of steel.

5. Failure to instruct employees working in and around the chromic acid tanks as to the hazards of their job.

6. Failure to instruct supervisors and workers in slab carrier operations in the proper selection, use and maintenance of respirators.

7. Water supply turned off and eye wash and drenching station not readily available where industrial batteries were being replaced and recharged.

8. A tin mill crane malfunctioned and the crane went out of control.

The Commissioner assessed penalties totaling $12,200 for these violations.[6]

The second safety order alleged "knowing" violations[7] of IOSHA safety standards arising from a June 17, 1991, incident in which an unsecured grate on a chromic acid tank slid out of place, causing an employee to fall into the tank. The order further alleged that during a recent maintenance, the bolts that secured the grate had been removed and were not replaced, and that there had been no immediate supply of clean cold water for washing off chemicals or other liquids. The Commissioner assessed penalties totaling $20,000 for these violations.

The IOSHA compliance safety and health officer who conducted the inspection was Harvey French. French had been a union employee of A.M. General Corporation in Mishawaka prior to being laid off in December 1989. Upon taking the position as compliance safety and health officer with the Labor Department in May 1990, French notified A.M. General of his new position. While employed with the Labor Department, French remained on layoff status with A.M. General and enjoyed "recall rights" of re-employment. French also had a vested pension with A.M. General.

Unbeknownst to French at the time he began a previous inspection of the LTV Steel facility in late 1990, LTV Steel and A.M. General were sister subsidiaries of the same parent corporation, LTV Corporation. At some point during the prior inspection, French became aware of the connection between the two corporations and advised LTV Steel officials of his layoff status with A.M. General. French was told by LTV Steel officials[8] that LTV

---

a violation of any safety standard or rule "serious" in nature were subject to civil penalties up to $1,000 per violation. *See id.* § 22–8–1.1–27.1(a)(2). In 1991, however, the Indiana legislature increased this figure to $7,000 per "serious" violation, *see id.* § 22–8–1.1–27.1(a)(2) (Supp.1991); P.L. 170–1991 § 25 (effective October 1991), and it remains so today. The definition of a "serious" violation remained the same.

**6.** *See infra* note 13.

**7.** To prove a "knowing" violation under IOSHA, the Commissioner is required to show that the employer acted voluntarily either in intentional disregard of, or in plain indifference to its employees. *See Union Tank Car,*

*Fleet Operations v. Commissioner of Labor,* 671 N.E.2d 885, 890 (Ind.Ct.App.1996), *transfer denied.* At the time of LTV Steel's inspection, employers who "knowingly" violated any safety standard, rule, or order were subject to civil penalties up to $10,000 per violation. Ind. Code § 22–8–1.1–27.1(a)(4) (1988). In 1991, the Indiana legislature amended this figure and currently sets the penalty at a minimum of $5,000 and a maximum of $70,000 for each knowing violation. *See id.* § 22–8–1.1–27.1(a)(6) (Supp.1991); P.L. 170–1991 § 25 (effective October 1991).

**8.** French informed John Carroll, the Manager of Safety Services for LTV Steel, about his employment status with A.M. General. He

Steel had no objection to his conducting the inspection and encouraged him to proceed.[9] Likewise, during the 1991 inspection at issue, no LTV Steel official or employee objected to French's participation in the inspection at the LTV Steel facility.

As noted above, French's inspection resulted in two safety orders dated September 23, 1991, being issued to LTV Steel. As authorized by section 28.1 of IOSHA, LTV Steel filed a petition for review dated October 10, 1991, denying each of the allegations in the safety orders.[10] At this point, the matter became subject to the procedural requirements of both IOSHA and the Indiana Administrative Orders and Procedures Act, Ind.Code § 4–21.5–1–1 et seq. ("AOPA"). Under IOSHA, the Commissioner certified the dispute to the Indiana Board of Safety Review ("Safety Board"). The Safety Board is given the power under IOSHA to affirm, modify, or dismiss any action of the Commissioner concerning an alleged violation (including any penalty and abatement period).[11] See Ind.Code § 22–8–1.1–30.1. By operation of AOPA, the Safety Board assigned the

matter to an administrative law judge for a hearing.

On March 24, 1993, LTV Steel filed a motion for summary judgment contending that the entire inspection conducted by French and the resulting safety orders were invalid because French had a statutorily prohibited conflict of financial interest when he conducted the inspection. The specifics of LTV Steel's summary judgment argument were (1) that section 9(a) of the statute governing Indiana state employee ethics ("Ethics Code")[12] provides, "A state officer or employee may not participate in any decision ... in which the state officer or the employee ... has a financial interest, Ind.Code § 4–2–6–9(a);" (2) that French participated in the decision to issue the safety orders to LTV Steel; (3) that French had a "financial interest" within the meaning of section 1 of the Ethics Code, in LTV Steel arising out of his employment relationship with A.M. General/LTV, id. § 4–2–6–1(9); and (4) as a result, French's inspection had been conducted in violation of Indiana law and the safety orders should be vacated. LTV Steel also provided an additional argument in support of partial summary judgment.

also informed Dennis Adams, the Chairman of the Safety and Health Committee of United Steelworkers of America.

9. On August 8, 1991, while French was conducting the LTV Steel inspection, A.M. General granted French a "recall slip." At the time he received the recall, French had been working for the Labor Department for just over one year. French chose to waive his recall rights for 60 days and finished the inspection. On October 28, 1991, French formally tendered his resignation from A.M. General.

10. In addition to denying each of the allegations in the safety orders, LTV Steel's petition for review contended that one allegation contradicted federal law and a prior IOSHA order, that three of the allegations were preempted by federal regulation, and that it possessed insufficient knowledge of one of the cited conditions to constitute a violation. As to the chromic acid incident, LTV Steel denied the allegations and further contended that the safety standard cited by the Commissioner was not applicable to the facts.

11. The Safety Board consists of five members appointed by the Governor, two of whom are drawn from backgrounds with labor organizations, two from backgrounds with employers, and one (the chairman) "from the highest membership classification of the American Society of Safety Engineers." Ind.Code § 22–8–1.1–31.

12. The statute governing Indiana state employee ethics is codified at Ind.Code § 4–2–6–1 et seq. Section 2 of that statute creates a State Ethics Commission and section 3 directs the Ethics Commission to adopt rules establishing "a code of ethics for the conduct of state business." Unless the context otherwise requires, the use of the term "Ethics Code" in this opinion refers to the statute and rules promulgated thereunder. And all Ethics Code references to the Indiana Code in this opinion can be found in the 1988 main volume or the 1990 supplements thereto, and Ethics Code references to the Indiana Administrative Code can be found in the 1991 version, which were the versions in effect at the time of the inspection.

For purposes of our decision today, it is sufficient to say that on May 13, 1993, the administrative law judge denied the motion for summary judgment without explanation.[13] On February 24, 1995, the Safety Board reversed the administrative law judge's decision and granted summary judgment to LTV Steel. The Safety Board held that the inspection conducted by French was invalid because French had a conflict of financial interest that violated section 9 of the Ethics Code. Having rendered the inspection invalid, the Safety Board dismissed *all* IOHSA violations that were subject to the ALJ's recommendation.

Exercising the right of judicial review of agency action under chapter 5 of AOPA, the Commissioner appealed the decision of the Safety Board. In this petition for review, the Commissioner argued that LTV Steel failed to demonstrate that French "was biased by [the] alleged financial interest," (R. at 1830), or that he "was influenced in any manner by the tenuous relationship between [LTV Steel] and A.M. General when he conducted the inspections." (R. at 1831.) Therefore, the Commissioner contended that the "Board's decision [was] arbitrary and capricious, ...

in excess of statutory jurisdiction, ... and otherwise not in accordance with the law, ... because there is no factual or legal basis upon which the Board could properly conclude that Harvey French's inspection of LTV was clouded by any conflict of interest." (R. at 1768–69.)

On September 16, 1996, the Marion Superior Court vacated the Safety Board's decision reversing the ALJ's denial of LTV Steel's motion for summary judgment and remanded the matter to the Safety Board for further review. In reaching its conclusion, the trial court agreed with the Commissioner's contention that there was no evidence that French was influenced by his attenuated relationship with A.M. General when he conducted the inspections at the LTV Steel plant. The trial court further determined that dismissing the IOSHA violations based on a "purported conflict" of a regulatory inspector would contravene public policy because such action would "unjustifiably reward LTV [Steel] for ignoring health and safety regulations." (R. at 1894.) But on January 12, 1998, the Court of Appeals reversed the trial court and reinstated the determination of the Safety Board. *LTV Steel Co. v. Zeller*, 686 N.E.2d 904 (Ind.Ct.App.1997).[14]

13. The ALJ's May 13, 1993 order denying LTV Steel's motion for summary judgment and partial summary judgment was not accompanied by findings of facts or conclusions of law. From June 28–30, 1993, the ALJ held a hearing to determine the merits of the contested safety orders. On April 4, 1994, the ALJ's first recommendation upheld most of the violations but recommended that the Board downgrade the second safety order regarding an employee falling into the chromic acid tank from "knowing" to "serious." Both LTV Steel and the Department of Labor appealed to the Safety Board where LTV Steel renewed its summary judgment motion. On August 16, 1994, the Safety Board remanded the case to the ALJ, instructing the ALJ to provide a factual basis for his earlier decision. The ALJ issued a second recommended decision on December 29, 1994. In it, the ALJ upheld two violations of the first safety order, which amounted to an $800.00 fine, and all other violations were dismissed or reclassified to "de minimus," resulting in no fines. With respect to the second safety order, the ALJ

maintained the "serious" reclassification and penalized LTV for $1,000.00. However, in neither recommendation did the ALJ address the issue of whether French had a conflict of financial interest, the basis of LTV Steel's summary judgment motion and this appeal. Both parties again appealed to the Safety Board and LTV Steel continued to argue its position that the "underlying inspection was invalid as being performed in violation of" the Ethics Code.

14. When this case was on review with the Court of Appeals, Kenneth Zeller held the position of Commissioner of the Indiana Department of Labor ("IDOL"); however, John P. Griffin presides as the current Commissioner of IDOL. Indiana Trial Rule 25(F)(1) provides in pertinent part:

When a public officer is a party to an action or other proceeding in an official capacity and during its pendency ... ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party. Proceedings following

*Discussion*

■ While the legislature has granted courts the power to review the action of state government agencies taken pursuant to the Administrative Orders and Procedures Act, this power of judicial review is limited. *See State Bd. of Registration for Prof'l Eng'rs v. Eberenz,* 723 N.E.2d 422, 430 (Ind.2000); *Indiana Dep't of Envtl. Management v. Conard,* 614 N.E.2d 916, 919 (Ind.1993); *Indiana Dep't of Natural Resources v. United Refuse Co.,* 615 N.E.2d 100, 103 (Ind.1993). A court may only set aside agency action that is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

*See* Ind.Code § 4–21.5–5–14(d).

■ While an appellate court grants deference to the administrative agency's findings of fact, no such deference is accorded to the agency's conclusions of law. *See Indiana Dep't of Pub. Welfare v. Payne,* 622 N.E.2d 461, 465 (Ind.1993), *reh'g denied*; *Board of Trustees of the Pub. Employees' Retirement Fund of Ind. v. Miller,* 519 N.E.2d 732, 733 (Ind.1988). An interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself. *See Indiana Dep't of State Revenue v. Bulkmatic Transport, Co.,* 648 N.E.2d 1156, 1158 (Ind.1995); *cf. Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986). But an administrative agency does not have the power to make decisions properly committed to another agency.

*See Spoon v. Town of Pittsboro,* 706 N.E.2d 254, 257 (Ind.Ct.App.1999); *Bell v. State Bd. of Tax Comm'rs,* 651 N.E.2d 816, 819 (Ind.Tax 1995); *see also* Charles H. Koch, Jr., *Administrative Law and Practice* § 11.26, at 140 (2d ed. 1997) ("Courts will give no special deference to interpretation by one agency of another agency's rules."). An administrative agency has only those powers conferred on it by the legislature, and unless we find the grant of powers and authority in the statute, we conclude that no power exists. *See Citizens Action Coalition of Ind., Inc. v. NIPSCO Northern Ind. Pub. Serv. Co.,* 485 N.E.2d 610, 612 (Ind.1985), *cert. denied,* 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986).

■ For the reasons discussed below, we find the action of the Safety Board in dismissing the safety orders was not in accordance with law, Ind.Code § 4–21.5–5–14(d)(1), and was in excess of the Safety Board's statutory jurisdiction, *id.* § 4–21.5–5–14(d)(3).

I

The legislature has entrusted to the State Ethics Commission the authority to establish, interpret, and enforce a code of ethics for the conduct of state business. *See* Ind.Code § 4–2–6–1 *et. seq.* The Ethics Code (the ethics statute and the regulations promulgated pursuant thereto) constitutes a comprehensive remedial scheme. Of particular relevance to this case, Ind. Code § 4–2–6–4(a)(2) authorizes the Ethics Commission to receive and hear all complaints alleging a violation of the Ethics Code. It may reject or dismiss any such complaint without further investigation, *id.* § 4–2–6–4(b)(2)(A); must investigate any alleged violation not rejected or dismissed, *id.* § 4–2–6–4(b)(2)(C); may determine whether a violation occurred using a probable cause standard, *id.*; must conduct a public hearing where probable cause has

substitution shall be in the name of the substituted party....

Accordingly, John P. Griffin "is automatically substituted as a party" for Kenneth Zeller.

been found to exist, *id.*; must provide the alleged violator "appropriate due process protection" during the hearing, *id.* § 4–2–6–4(b)(2)(D); and must issue findings of fact after a hearing, *id.* § 4–2–6–4(b)(2)(E). When the Ethics Commission finds that a violation has occurred, it is authorized to recommend a sanction to be imposed by the head of the state agency (called the "appointing authority") or the elected official for whom the violator is employed. *Id.* The Ethics Commission is also authorized to forward a copy of any complaint to the prosecuting attorney of the county in which the alleged violation occurred, *id.* § 4–2–6–4(b)(2)(A)(iii) & (H)(i), and to impose civil penalties, *id.* §§ 4–2–6–4(b)(2)(F) and 4–2–6–12.

■ It is clear from this regulatory scheme that the legislature intended the Ethics Commission to have exclusive jurisdiction to establish a code of ethics for the conduct of state business, *id.* § 4–2–6–3, and to adjudicate alleged violations thereof, *id.* § 4–2–6–4. The Ethics Commission shares with the appointing authority or state elected official for which or whom a violator is employed the authority to impose sanctions. *Id.* §§ 4–2–6–4(b)(2)(E)– (F) and 4–2–6–12. That is, when a state employee is alleged to have violated an ethics requirement, the allegation is not adjudicated by the appointing authority or state elected official for which or whom the alleged violator is employed but by the Ethics Commission. *See, e.g., Indiana State Ethics Comm'n v. Nelson,* 656 N.E.2d 1172 (Ind.Ct.App.1995) (state ethics requirement violations by State Department of Natural Resources employees adjudicated by Ethics Commission), *transfer denied.*

The Safety Board resolved this case by adjudicating French to have had a "financial interest" as defined by the Ethics Code [15] and thereby violated Ind.Code § 4–2–6–9 [16] which prohibits a state employee from "participat[ing] in any decision or vote of any kind in which the state ... employee ... has a financial interest." [17] *Id.* § 4–2–6–9(a) (1990); *see also* Ind. Admin. Code tit. 40, r. 2–1–9(f) (Supp.1991). In making these determinations, the Safety Board exceeded its jurisdiction. We shall examine IOSHA, the statute under which the Safety Board operates in some detail *infra,* but point out here that there is nothing in it that authorizes the Safety Board to adjudicate violations of the Ethics Code. And, as we just explained, we find such to be within the exclusive jurisdiction of the Ethics Commission.

---

15. Ind.Code § 4–2–6–1(9) (1990) states that a "financial interest means an interest:

    (A) distinct from that:
      (i) of the general public; or
      (ii) as a state employee;
    (B) in a purchase, sale, lease, contract, option, or other transaction between an agency and any person;
    (C) involving property or services; and
    (D) in which a state officer or an employee or that individual's spouse or unemancipated children may gain a benefit of two hundred fifty dollars ($250) or more.
This term includes an interest arising from employment or prospective employment for which negotiations have begun...."
    Ind. Admin. Code tit. 40, r. 2–1–4 (Supp. 1991) characterizes "financial interest" as "economic interest," meaning a "substantial financial interest in investments, employment, awarding of contracts, grants, loans, purchases, leases, sales or similar matters under consideration or consummated between a state agency over which the person has jurisdiction or in which the person is employed."

16. Although not relevant to the decision we make today, we recognize that the Indiana legislature has since twice amended Indiana Code § 4–2–6–9 which now reads, "A state officer or employee may not participate in any decision or vote of any kind in which the state officer or the employee, or that individual's spouse or unemancipated children has a financial interest." (As amended by P.L. 15– 1992 § 5 and P.L. 22–1995 § 2).

17. We need not and do not resolve whether French's disclosed relationship to a corporate sibling of LTV rose to the level of a "financial interest" in French's decisions as an inspector of LTV, or even if it did, whether LTV was in a position to complain after inviting French to continue when the affiliation between LTV and A.M. General was discovered.

At least two policy reasons for entrusting such determinations exclusively to the Ethics Commission seem clear to us. If each state agency were to issue its own interpretations of what, say, constituted an impermissible financial interest, the standards would inevitably vary from agency to agency. This would make compliance unnecessarily difficult, especially for employees who are reassigned among agencies or who may perform responsibilities for more than one. We get a sense of such inconsistency in this case where the Safety Board, the trial court, and the Court of Appeals each tried their respective hands at interpreting the meaning of "financial interest" in the Ethics Code with varying results. Second, though not directly implicated here, entrusting such determinations to a single agency assures consistency in the application of due process rights of alleged violators.[18]

## II

While it appears to us undeniable that all of the Safety Board, trial court, and Court of Appeals engaged in an adjudication that was within the exclusive jurisdiction of the Ethics Commission, we do not rest our analysis exclusively on that conclusion. We also conclude that even if French had been properly found by the Ethics Commission to have had an impermissible financial interest in LTV Steel,[19] such a finding would not have provided LTV Steel with a statutory basis for dismissal of the safety orders. None of the Ethics Code, IOSHA, or AOPA suggests any authority for a state ethics violation by an inspector serving as a defense to allegations of serious workplace safety violations.

## A

We return to the Ethics Code, this time to examine whether it expressly or impliedly authorizes a violation thereof to be employed as a defense in an IOSHA safety enforcement proceeding.

Section 9 provides: "A state officer or employee may not participate in any decision or vote of any kind in which the state officer or the employee or that individual's spouse or unemancipated children has a financial interest." Ind.Code § 4–2–6–9 (1990). If the Ethics Commission finds a violation of this requirement, the Ethics Code contains two provisions governing sanctions. First, the Ethics Commission "may make a recommendation for the sanctions to be imposed by the appointing authority or state officer [for whom the violator works] for the violation, including: (i) reprimand; (ii) suspension with or without pay; or (iii) dismissal of an employee." *Id.* § 4–2–6–4(b)(2)(E). Second, the Ethics Commission "may also take any of the actions provided in section 12 of" the Ethics Code. *Id.* Section 12 authorizes the following actions:

(1) Impose a civil penalty upon a respondent not to exceed the greater of: (A) three (3) times the value of any benefit received from the violation; or (B) ten thousand dollars ($10,000).

(2) Cancel a contract.

(3) Bar a person from entering into a contract with any agency for a period specified by the commission. The period specified by the commission may not exceed two (2) years from the date the action of the commission is effective.

*Id.* § 4–2–6–12. It is clear that the express language of the Ethics Code does not authorize the dismissal of an IOSHA safety order as a sanction for a violation of the Ethics Code.

Nor do we find such authority implied by the statute. First, the structure of the Ethics Code is clearly pointed at sanction-

---

18. Here, French has been found by the Safety Board and the Indiana Court of Appeals to have violated the State Ethics Code, violations of which carry severe sanctions, without ever having had any due process at all.

19. There is nothing in the record to suggest that LTV Steel filed a complaint with the Ethics Commission alleging a violation by French.

ing state employees who violate the Ethics Code and not conferring benefits on third parties arguably injured by a state employee's violation. All of the sanctions impinge upon the individual state employee personally. It is true that the Ethics Code remedy providing for the cancellation of a contract entered into in violation of the Ethics Code could confer a benefit on a party which had unsuccessfully sought the contract in the sense that that party might again be able to seek the contract. But where the legislature specifically provided the remedy of contract cancellation without providing a counterpart remedy of regulatory action dismissal, we are unable to infer any legislative intent that the Ethics Code be available as a defense against an IOSHA safety order.

■ This conclusion comports with the law generally applicable to the ability of private parties to enforce rights under particular statutes. As a general rule, a private party may not enforce rights under a statute designed to protect the public in general and containing a comprehensive enforcement mechanism. *See, e.g., Ritz v. Indiana & Ohio R.R.*, 632 N.E.2d 769, 775 (Ind.Ct.App.1994), *transfer denied*; *Coons by Coons v. Kaiser*, 567 N.E.2d 851, 855 (Ind.Ct.App.1991), *reh'g denied*; *Borne by Borne v. Northwest Allen County Sch. Corp.*, 532 N.E.2d 1196, 1203 (Ind.Ct.App. 1989); *Hirschauer v. C & E Shoe Jobbers, Inc.*, 436 N.E.2d 107, 111 n. 4 (Ind.Ct.App. 1982). We hold that because the Ethics Code is designed to protect the public in general and contains a comprehensive enforcement mechanism, it implies no entitlement for use as a defense against an IOSHA safety order.

### B

We also find that IOSHA itself neither expressly nor impliedly authorizes a violation of the Ethics Code to be employed as a defense in an IOSHA safety enforcement proceeding.

At the time the safety orders were issued to LTV Steel, the text of IOSHA contained no express affirmative defenses to alleged workplace safety violations. In 1995, the legislature added a new section to IOSHA recognizing "an affirmative defense for a violation of any standard, rule, or order that is the result of employee misconduct." Ind.Code § 22–8–1.1–27.2 (as added by P.L. 224–1995 § 1). The fact that the legislature has provided an affirmative defense only for employee misconduct leads us to conclude that the legislature did not intend that IOSHA itself provide any other affirmative defenses to alleged IOSHA violations.

We believe this conclusion is harmonious with the central purpose and basic policy of IOSHA.[20] As set forth *supra*, IOSHA requires that every Hoosier employer must "establish and maintain conditions of work which are reasonably safe and healthful for employees, and free from recognized hazards that are causing or are likely to cause death or serious physical harm to employees." Ind.Code § 22–8–1.1–2. Further, every Indiana employer must "comply with the occupational health and safety standards" established under IOSHA. *Id.* § 22–8–1.1–3.1. To permit an employer to have allegations of IOSHA violations against it dismissed on the basis that the IOSHA inspector had a conflict of financial interest not permitted by the Ethics Code would frustrate the Commissioner's obligation under IOSHA to enforce safety orders to "establish and maintain conditions of work which are reasonably safe and healthful for employees." *Id.* § 22–8–1.1–2; *see also id.* § 22–8–1.1–22.1 (setting forth the Commissioner's enforcement power under IOSHA). An inspector's Ethics Code impermissible financial interest in no way excuses or

---

**20.** Congress has explained that the purpose of the federal Occupational Safety and Health Act, which IOSHA implements in Indiana, is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b) (1994).

mitigates workplace safety violations.[21] Given the pervasive emphasis in IOSHA on an employer's duty to maintain a safe workplace, we are unable to find an implied affirmative defense for violations of the Ethics Code.

### C

Lastly, we turn to AOPA and find that it, like the Ethics Code and like IOSHA, neither expressly nor impliedly authorizes a violation of the Ethics Code to be employed as a defense in an IOSHA safety enforcement proceeding.

In reaching this conclusion, we note three parts of chapter 3 of AOPA: (1) Section 14, which discusses certain requirements for proceedings before an administrative law judge, recognizes that a party may assert "an affirmative defense specified by law," Ind.Code § 4–21.5–3–14(a)(c); AOPA itself does not provide or otherwise enumerate any affirmative defenses, (2) Section 13 contains a specific provision prohibiting an investigator in a regulatory proceeding from serving as an administrative law judge or assisting or advising the administrative law judge in any way, *id.* § 4–21–5–3–13; and (3) sections 9, 10, and 12 collectively contain an extensive set of provisions governing the disqualification of administrative law judges on grounds of bias. Our examination of these three parts of AOPA lead us to conclude that, while the legislature specifically considered the role of affirmative defenses, regulatory investigators, and bias in writing the AOPA, it did not provide or suggest that an investigator's impermissible financial interest under the Ethics Code could serve as any type of defense in AOPA proceeding.

### III

Animating much of LTV Steel's argument is its contention that unless it can deploy the provisions of state employee ethics rules in its defense, employers have "no remedy in situations, like this one, where the inspection is tainted by serious impropriety or illegal conduct by the inspector." LTV's Br. in Opp'n to Comm'r's Pet. to Transfer at 7.[22] With remarkable candor, LTV Steel employs the following analogy: "LTV has merely raised the statute as a basis for invalidating the inspection, just as a defendant in a criminal case, defending himself against charges brought against him, might claim the investigators conducted an unreasonable search and seizure." *Id.* at 6.

■ Employers' protection against wrongful allegations of safety violations is the elaborate administrative and judicial review provisions of the AOPA. This protection, constitutional in dimension,[23] gives

---

21. This appears to be the context of the trial court's conclusion that "[s]etting aside the Safety Orders for a purported conflict would unjustifiably reward LTV [Steel] for ignoring health and safety regulations endangering its plant's employees." (R. at 1893–94.)

22. LTV Steel begins its brief to the Court of Appeals as follows:

Increasingly of late, local and national newspapers and media interests have carried substantial news stories regarding claims of corruption by government officials. Whether those stories concern Arkansas, Washington, D.C., or Indianapolis, Indiana, one abiding element exists in each: the citizenry opposes actions by government officials which aggrandize the power, position, or fortune of the government official because he or she has the authority to make a decision affecting others. That is

the central core of the definition of conflict of interest.

Appellant's Br. at 1. While we appreciate the point LTV Steel makes, we question its relevance to this case which we do not perceive to involve any question of government corruption. At no point does LTV Steel accuse French of corruption.

23. The Due Process Clause ensures that "no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). Thus, self-dealing or bias on the part of a hearing officer would contravene not only the AOPA but the Constitution itself. *Marshall* also indicates that the Due Process Clause imposes some limits, which we do not find implicated

an employer a broad opportunity to exonerate itself from allegations of workplace safety violations. But this protection, at least under current law, does not extend to an automatic dismissal of charges on grounds that the safety inspector violated the Ethics Code.

### Conclusion

The Safety Board's dismissal of the two safety orders issued to LTV steel is reversed. This matter is remanded to the Safety Board for further proceedings consistent with this opinion.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.

here, on "administrative prosecutors," a category of persons which we believe could include government investigators. *Id.* at 249–

50, 100 S.Ct. 1610. LTV Steel alleges no violation of the Due Process Clause.