COMMISSIONER, DEPARTMENT OF REVENUE and State Department Revenue, Appellants–Respondents,

v.

Mark J. PARTLOW, Appellee–Petitioner.

No. 49A02–0110–CV–659.

Court of Appeals of Indiana.

June 19, 2002.

Steve Carter, Attorney General of Indiana, Nandita G. Shepherd, Deputy Attorney General, Indianapolis, IN, Attorney for Appellant.

Angel Luis Ortiz, Ortiz & Associates, Indianapolis, IN, Attorney for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

The Commissioner of the State Department of Revenue, and the State Department of Revenue (collectively "Department") appeal from the trial court's judgment reinstating Mark J. Partlow's commercial driver's license ("CDL").

We affirm.

### ISSUE

Whether the trial court erred by ordering the Department to issue Partlow a CDL after the Department determined that Partlow did not meet the medical qualifications.

### FACTS

After a seizure at the age of 15, Partlow was diagnosed with epilepsy. Partlow, 37 years of age at the time of the judicial review hearing in this matter in May 2001, has not experienced any seizures since 1986. However, through the time of the administrative review hearing in February 2001, Partlow continued to take a minimal

dose of an anticonvulsant medication, Phenobarbital.

Partlow has worked for the same company, Atkins Excavating, since 1988. He drives forklifts, trucks, and backhoes in the Indianapolis metropolitan area. Due to a requirement instituted in the 1990s, operators of such equipment must hold a CDL.

The Department's Motor Carrier Services Division is responsible for issuing CDLs. Partlow submitted his initial application for a CDL in 1992.[1] He submitted physical examinations and/or applications thereafter in 1994, 1996, 1998, and 2000. Each application was approved, with a restriction for intrastate travel, until 2000 when a Department reviewer saw that the history section of the application was marked "yes" for "seizures, fits, convulsions, or fainting," and that Partlow's physician prescribed the drug Phenobarbital. (App. 33). With his 2000 application, Partlow submitted to a U.S. Department of Transportation physical which revealed that he was medically qualified to operate a motor vehicle. Partlow's application was referred to the Indiana Drivers Licensing Advisory Committee ("IDLAC") for an audit of his physical certification.

IDLAC recommended that the Department not issue Partlow a CDL, even intrastate, until he had been "off all anticonvulsants and seizure free for five years." (App. 34). The Department followed the IDLAC recommendation and sent Partlow a letter advising him of that decision on December 19, 2000.

Partlow sought administrative review and was granted a hearing before a Department Administrative Law Judge (ALJ) on February 6, 2001. The CDL supervisor for the Motor Carrier Services Division, Carol Grubbs, testified at the administrative hearing. She stated that epilepsy is a condition that is reviewed on an individual basis when assessing whether a person meets the physical requirements for a CDL. She also stated that it is the Department's policy to follow the IDLAC recommendation.

At the administrative hearing, Partlow testified that he could not remember the total number of seizures he had experienced. Although he had been prescribed Dilantin and Phenobarbital for his seizures when he was younger, he estimated that he had not taken any Dilantin for 7 to 12 years. Further, on direct examination, he testified that originally his dose of Phenobarbital was 60 milligrams, but at the time of the administrative hearing his dose was set at 30 milligrams every other day. Also, Partlow's treating physician had indicated that Partlow might, in the future, be able to discontinue the Phenobarbital.

The ALJ issued findings of facts and conclusions of law filed with the proposed order denying Partlow's request for an intrastate CDL. The ALJ recognized that a medical examiner determined that Partlow was medically qualified to obtain a CDL and that "49 CFR 391.43 requires the medical certification to be made by a medical examiner;" however, the ALJ found that the "certifying physician clearly ignored the requirements of 49 CFR 391.41, 49 CFR 391.43 and the Conference on Neurological Disorders and Commercial Drivers report." (App. p. 77). The ALJ determined that IDLAC's recommendation to deny Partlow a CDL renewal was consistent with the law because

IDLAC is intimately familiar with the federal regulations, state laws and medi-

---

1. CDLs "expire on the last day of the applicant's birth month four (4) years after … issuance." Ind. Admin. Code tit. 140, r. 7–3– 7(b) (2001). Generally, applicants must pass physical examinations biennially. 140 IAC 7–3–3(7).

cal regulatory guidelines prepared by the FHWA. As such, IDLAC is more than qualified to offer an opinion as to whether a certification is made in accordance with the law, without a direct physical examination. In Petitioner's case, it is clear that any certification that states he is medically qualified to operate a commercial vehicle was made without respect to the laws governing the issuance of interstate CDLs.

(R. 77). The ALJ found that even if Partlow had suffered only one seizure, the medical regulations "require that he be seizure free and off medication for at least five (5) years before he could possibly qualify for a CDL." (App. p. 77). Relating the requirements to Partlow's circumstances, the ALJ found:

> Petitioner is still taking medication. Additionally, Petitioner may have suffered multiple seizures. If he were off medication, it is likely more of these would occur. Petitioner's condition is more akin to epilepsy, and the medical regulatory criterion establishes a waiting period for qualification.

(App. p. 77). The ALJ also found:

4) Based on the evidence submitted and the applicable law, Petitioner has been diagnosed with a disqualifying condition under 49 CFR 391.41(b)(8). He can not (sic) qualify for an interstate CDL unless he remains seizure free and off medication for five (5) years.

5) Petitioner does not qualify to hold an intrastate commercial driver's license. IDLAC has reviewed Petitioner's medical history and determined that he poses a risk to public safety. In drawing this conclusion, IDLAC has mirrored the recommendation of the medical regulatory guidelines for individuals suffering from epilepsy. Petitioner would need to remain both seizure free and off medication for five (5) years before he could possibly qualify for a CDL.

(App. pp. 77–78).

Partlow requested judicial review of the administrative decision. A hearing was held on July 16, 2001. The parties reviewed the evidence in the record after the administrative hearing, and Partlow's physician, Robert C. Beesley, M.D., testified. Dr. Beesley had been Partlow's physician since 1985. The following colloquy occurred on direct examination:

Q Uh ... you also testified that this Phenobarbital has been; you have been cutting back, because Mr. Partlow does not really need it.

A At this point in time, that's not; it's not likely he does.

Q He (sic) is not likely that he does need it anymore?

A That is correct.

Q Okay. So, why was he; why is he prescribed Phenobarbital now if he does not need it?

A Well, the question is difficult to answer because in a situation where you have a patient; even though it was an isolated seizure episode; sometimes we will elect when their occupation is dependent upon their being able to secure a driver's license. More or less as a protective measure. The only way you can know with absolute certainty is to simply withdraw the medication. The odds of having another seizure after; well since his teenage years, of that being an isolated incident; are extremely remote. But, sometimes we just don't want to take that risk.

Q So, the only reason that Mr. Partlow; that you prescribed the medication to Mr. Partlow, has been to prevent or not take that risk of him

having another seizure. Which he could or could not have.

A Exactly.

(App. p. 21). The court propounded questions to Dr. Beesley:

> **THE COURT:** Doctor, Phenobarbital, is that considered an anti-seizure medication?

A It was originally; it is an ancient medication by today's standards, and yes it was; that was one of the uses it had originally. Uh ... Mr. Partlow's current dose is almost homeopathic in nature.

> **THE COURT:** I understand. 30 milligrams is very minute in comparison to a person that has a seizure; serious seizure problem.

A Correct.

> **THE COURT:** And as a matter of fact, isn't Phenobarbital a very mild treatment of this condition?

A Yes, it is.

> **THE COURT:** And you had prescribed something else; well at one time, they were prescribing Dilantin, now it is something else for real serious seizure problems, aren't they?

A Yeah, there are multiple new medications that we [prescribe] for those that we feel are at a very high risk.

> **THE COURT:** And uh ... would Phenobarbital be at the bottom of the scale in terms of these medications?

A Way down there, yes.

> **THE COURT:** Way down there. All right. And you say his dosage is minute, is that correct?

A That is correct

> **THE COURT:** Almost what?

A Homeopathic.

> **THE COURT:** Okay, and what homeopathic; could you sort of define that for me?

A Generally when we use that phrase with respect to medication; it means it's unlikely that it's therapeutic.

> **THE COURT:** But it's above a placebo, is that correct?

A That is correct.

(App. pp. 23–24).

The trial court entered an order stating, in pertinent part:

1. That the Court finds for the Petitioner Mark J. Partlow,

2. The Court further finds that the State should have granted the Petitioner his license since his last seizure [wa]s 22 years ago.[2]

3. That the medication the Petitioner is on has no real treatment effect.

4. That the driving Petitioner does is no more of a hazard than [the driving of] any other person.

> **WHEREFORE IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** That the State of Indiana and the Indiana Department of Revenue Commissioner of the Indiana Motor Carrier Service Division are hereby ORDERED to reinstate and issue Petitioner Mark J. Partlow a[CDL] being there [is] no legal reasoning for [the] revocation or suspension or denial.

(App. pp. 4–5) (footnote supplied).

### DECISION

The Department contends that the trial court erred by ordering the Department to reinstate Partlow's CDL because the Department's decision to deny Partlow's application was supported by substantial

---

**2.** The evidence demonstrates that Partlow's last seizure occurred in 1986.

evidence and not contrary to law. We disagree.

 A court reviewing an administrative decision may set aside the agency action only if it is:

1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

2) contrary to constitutional right, power, privilege, or immunity;

3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

4) without observance of procedure required by law; or

5) unsupported by substantial evidence.

*LTV Steel Co. v. Griffin,* 730 N.E.2d 1251, 1257 (Ind.2000). An agency's findings of fact are granted great deference, but no deference is accorded its conclusions of law. *Comm., Dept. of Rev. v. Fort,* 760 N.E.2d 1103, 1106 (Ind.Ct.App.2001), Kirsch, J. dissenting, (reversing a trial court determination that the Department erred by denying a CDL pursuant to 49 CFR § 391.41(b)(7) to an applicant with a vascular disease). "An interpretation of a statute by an agency charged with the duty of enforcing it is entitled to great weight, unless the interpretation would be inconsistent with the statute itself." *Id.* "When the facts are undisputed, we are asked to apply a statutory provision to a set of facts, and therefore the question is one of pure law." *Id.* The facts are not in dispute here. The question presented is one of pure law.

Within Indiana Code § 8–2.1–24–18, our legislature incorporated into Indiana law the U.S. Department of Transportation (DOT), Federal Motor Carrier Safety Administration (FMCSA) regulations with regard to physical and medical qualifications for CDLs. *See* Ind.Code § 8–2.1–24–18; 49 CFR § 391.41.

 The ALJ based the decision to deny Partlow a CDL on two main factors: 1) a section of 49 CFR § 391 that addresses epilepsy, and 2) a 1988 report from a conference on the effects of neurological disorders on commercial drivers sponsored by the Office of Motor Carriers ("OMC"), the Federal Highway Administration ("FHWA"), and the United States Department of Transportation ("DOT").

49 CFR § 391.41(b)(8)—Subpart E— Physical Qualifications and Examinations [3] provides in pertinent part:

**3.** In conjunction with 49 CFR § 391.41, the FMCSA issued medical advisory criteria for assessing eligibility for a CDL to assist medical examiners conducting evaluations. The advisory criteria contain a prefatory note:

Unlike regulations which are codified and have a statutory base, the recommendations in this advisory are simply guidance established to help the medical examiner determine a driver's medical qualifications pursuant to Section 391.41 of the Federal Motor Carrier Safety Regulations (FMCSRs). The Office of Motor Carrier Research and Standards routinely sends copies of these guidelines to medical examiners to assist them in making an evaluation. The medical examiner may, but is not required to, accept the recommendations. Section 390.3(d) of the FMCSRs allows employers to have more stringent medical requirements.

The advisory criterion for 49 CFR § 391.41(b)(8), the only citation to authority offered by the Department, contains the language of the codified section and then offers recommendations for analyzing the section. Although the language is correct, the advisory contains punctuation and emphasis that does not appear in the codified section, thus parsing a single statement into disjunctive sections that stand alone. Based upon the advisory section, the Department contends that the section states:

A person is physically qualified to drive a commercial vehicle if that person:

Has no established medical history or clinical diagnosis of epilepsy;

*or*

(b) A person is physically qualified to drive a commercial motor vehicle if that person—

(8) Has no established medical history or clinical diagnosis of epilepsy or any other condition which is likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle;

. . .

The plain language of the section provides that a person is qualified, even with a medical history or clinical diagnosis of epilepsy, if the condition is not "likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle." *Id.* Here, the uncontroverted testimony of Partlow's physician was that 1) it was not likely that Partlow's condition continued to require the anti-seizure medication; 2) the amount of medication prescribed for Partlow was not likely to be therapeutic; and 3) the risk of Partlow experiencing another seizure was "extremely remote." (App. 21). Thus, under the regulation, Partlow could qualify for a CDL.

We also note that the tenor of section (b) of the regulation is stated in the affirmative. It commences with the premise that a person is qualified for a CDL. It subsequently provides that when a person has a specified condition or impairment, most often an assessment is to be undertaken of the person's condition with regard to its likely interference with the ability to safely operate a commercial vehicle. *See* 49 CFR § 391.41(b)(1) through (13).

We turn to the other basis for the ALJ's decision, the 1988 report by the Conference on Neurological Disorders and Commercial Drivers. The executive summary from the report concluded that the use of Phenobarbital prescribed for headaches[4] "may warrant disqualification." (App. 110). Further, with regard to seizures and epilepsy, the executive summary concluded:

> It *would seem* that individuals with a history of epilepsy off anticonvulsant medication and seizure-free for *10 years should not be restricted* from obtaining a license to operate a commercial vehicle.
>
> Special factors *may allow* future identification of individuals with acceptable risk for further seizures, permitting shorter seizure-free intervals. Information allowing specific recommendations is not presently available, and further data collection is needed on this condition.

(App. pp. 111–12) (emphasis added). Thus, pursuant to the recommendations within the report, a driver who has been seizure free and free of anticonvulsant medication for a period of 10 years might

---

> Any other condition which is likely to cause the loss of consciousness; or any loss of ability to control a commercial motor vehicle.

Without reference to the qualification that the condition must be "likely to cause the loss of consciousness or any loss of ability to control a commercial motor vehicle," the Department contends that a "medical history or clinical diagnosis of epilepsy" disqualifies a person from receiving a CDL. As noted in the prefatory remarks, the section is merely advisory. The Department and courts reviewing the agency's actions are bound by the codified regulation found at 49 CFR § 391.41(b)(8), Subpart E—Physical Qualifications and Ex-

aminations, as set out above. Further, if, as implied by the Department, a diagnosis or clinical history of epilepsy resulted in a blanket disqualification, there would be no need for the medical advisory criteria recommending an evaluation based upon the circumstances and the medications prescribed before determining whether a person may be qualified to obtain a CDL. Also, such a contention does not comport with the Department's stated policy of assessing those diagnosed with epilepsy on an individual basis.

4. There is no evidence before us that Partlow suffers from headaches.

qualify for a CDL. Further, the report indicates that with the advancement in medical diagnostics, a shorter disqualification period may be warranted.

However, the committee report itself specifically noted that the recommendations were based upon the special concerns attendant to *interstate* commercial drivers; thus, the recommendations were inapplicable to licensing for other than interstate commercial drivers:

> It should be made clear that recommendations for licensure to operate commercial vehicles to be used in interstate commerce are not necessarily appropriate for licensure for other driving activities. Drivers involved in interstate driving activities are required to drive long hours, may have meals at irregular intervals, are frequently subjected to high levels of stress, and are frequently sleep deprived. Even though these factors have as yet to be shown to aggravate seizure disorders in rigorous studies, all are factors suspected by both clinicians and patients alike to increase the risk for seizures. Should medical problems of any sort develop, these individuals are often far from their usual source of medical care. For these reasons, criteria for restrictions for licensure to operate commercial vehicles used in interstate commerce due to seizures (and other medical conditions) may be more stringent.

(App. p. 148). *Cf. Fort,* 760 N.E.2d at 1107, Kirsch, J. dissenting, (in context of an interstate CDL application, report aids interpretation of the regulations).

The foregoing explicitly limited the report to the specific concerns attendant to *interstate* commercial driving. The report recognizes that the specific concerns identified as potentially exacerbating a seizure condition, *e.g.,* lack of reliable medical care, changing schedules, strict hauling deadlines with little time to eat or sleep, are peculiar to *interstate* commercial drivers. According to the record, Partlow drives in an area confined to the Indianapolis metropolitan area.[5] Hence, the concerns attendant to interstate driving are not directly applicable here.

We also note that although Indiana Code § 8–2.1–24–18 specifically incorporated 49 CFR § 391 for applicability to both interstate and intrastate CDLs, exceptions to strict adherence with the regulation exist within Indiana Code § 8–2.1–24–18 for some intrastate commercial drivers including: those hired before September 1, 1985 who do not chauffeur people; those hired before September 1, 1985 who are engaged in intrastate cartage of property incidental to employment in a construction-related field; those engaged in farming operations; and certain insulin-dependent diabetics. *See* I.C. § 8–2.1–24–18(e)(i). We note these exceptions, not because Partlow fits neatly into one of the categories, but because it is clear that intrastate drivers who are not chauffeuring people are not always held to the same medical standards as interstate drivers.

Further, we note that 49 CFR § 391.43, describing the qualifications for medical examiners and the matters within 49 CFR § 391.41 of which medical examiners must be aware when issuing certificates of physical examination, lists yet another set of guidelines for assessing neurological function on an individual basis. Epilepsy is not specified within the neurological function assessment.

In summary, the medical evidence indicates 1) that Partlow had not experienced

5. At the judicial hearing, Partlow's employer interjected that Partlow drives around Interstate 465 (App. 10), a portion of interstate highway system confined to the Indianapolis metropolitan area.

a seizure in approximately 15 years; 2) that Partlow had discontinued Dilantin 7 to 12 years before the administrative hearing; 3) that, at the time of the hearings, Partlow was prescribed less than a prophylactic dose of Phenobarbital; 4) that in all likelihood, Partlow could discontinue the Phenobarbital; and 5) that Partlow's physician believed that the likelihood that he would experience another seizure was "extremely remote." (App. 21). Other evidence established that 1) Partlow had worked for the same employer since 1988; 2) his employment-related driving was intrastate; 3) the Department had issued Partlow an intrastate CDL from 1992 through 1998; and 4) the Department purported to view the circumstances attendant to an applicant's epileptic condition on an individual basis when considering whether to issue a CDL.

As stated, the Department relies upon portions of 49 CFR § 391.41, and the report by the Conference on Neurological Disorders and Commercial Drivers. The regulation, 49 CFR § 391.41(b)(8), recommends the disqualification of a person diagnosed with epilepsy when the condition is "likely to cause loss of consciousness or any loss of ability to control a commercial motor vehicle." The 1988 report would disqualify an *interstate* driver until he had been seizure free and free of anticonvulsant medication for 10 years. The ALJ determined that Partlow could be considered for a CDL when he had been seizure free and free of anticonvulsant medication for a period of five years.

The evidence indicates that the Department ignored the uncontroverted testimony of Partlow's physician, and did not follow the regulation in 49 CFR § 391.41, the 1988 report, or the Department's stated policy of assessing applications by those diagnosed with epilepsy on an individual basis.

In Partlow's case, the Department's interpretation of the CDL statutory framework was inconsistent with that framework. Thus, the Department's action and final determination were arbitrary and capricious and unsupported by substantial evidence. The trial court did not err in concluding that, under the circumstances, Partlow was qualified to obtain a CDL.

Affirmed.

SULLIVAN, J., and BAKER, J., concur.